Barney Machinery Company v. Commissioner. Russell C. Niemeier v. Commissioner.
Barney Mach. Co. v. Commissioner
Docket Nos. 8780, 8950.
United States Tax Court
1947 Tax Ct. Memo LEXIS 145; 6 T.C.M. (CCH) 806; T.C.M. (RIA) 47199; July 9, 1947
Paul E. Hutchinson, Esq., and A. G. Wallerstedt, C.P.A., 747 Union Trust Bldg., Pittsburgh, Pa., for the petitioners. Homer F. Benson, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax and excess profits tax as follows: Excess Profits
Year
Income Tax
Tax
Barney Machinery Company
Docket No. 8780
1940
$ 4,702.66
$ 4,467.52
1941
13,491.61
53,382.32
Russell C. Niemeier
Docket No. 8950
1941
1,753.99
These proceedings have been consolidated for hearing and report. The issue in the petition of Russell C. Niemeier, Docket No. 8950, is controlled by decision of the first issue in the petition of Barney Machinery Company, Docket No. 8780, and the parties have agreed to *146 stipulate the amount of the income tax liability of Russell C. Niemeier under Rule 50 in accordance with the decision of the controlling issue in Barney Machinery Company. The questions to be decided arise out of the issues presented under the pleadings in Barney Machinery Company, Docket No. 8780. One question is whether compensation paid to officers of Barney Machinery Company in 1940 and 1941 was reasonable and deductible in the entire amount. Respondent has disallowed in each year part of the compensation of the officers. This question is made the second issue hereinafter. The other question is whether the income of an alleged joint venture known as Bowling, Barney and Niemeier, Associates, is taxable to the Barney Machinery Company, as respondent has determined. This question is made the first issue hereinafter. Several adjustments which the respondent has made in computing the taxable income in 1940 and 1941 of Barney Machinery Company are not in issue, but will be stipulated by the parties under a Rule 50 computation. The returns were filed with the collector for the twenty-third collection district of Pennsylvania. Findings of Fact Barney Machinery Company, a Delaware *147 corporation, was organized in 1925, with its principal office and place of business at Pittsburgh, Pennsylvania. It keeps its books of account and files its tax returns on the accrual basis. Hereinafter the Barney Machinery Company will be referred to as the petitioner or "Barney Company." During the taxable years, Barney Company's outstanding stock consisted of 1,097 shares of common stock which were held as follows: Shares
Per Cent
Harry Barney
550
50.14
Russell C. Niemeier
435
39.65
Ralph Barney
12
1.09
E. A. Mulson
50
4.56
E. R. Divelle
50
4.56
1,097
100.00
The officers and directors of Barney Company during the taxable years and for prior years, were as follows: Harry Barney - President, treasurer, director. Russell Niemeier - Vice President, director. Ralph D. Barney - Secretary. Helen Beal - Director. The common capital stock of Barney Company was carried at a stated value of $75,775. Harry Barney and Russell Niemeier were at all times members of the Board of Directors. Helen Beal was an employee of the Company. Barney Company conducts a business of selling machine tools under written exclusive selling agency contracts *148 with manufacturers. It carried on that business in the taxable years. The exclusive selling agreements usually give petitioner territories in which it serves as the sales representative of the manufacturer; also, the agreements restrict petitioner from selling competing products. Petitioner does not carry inventories, and it uses the method of reporting income where inventories are not an income determining factor. Petitioner's income is derived from commissions it receives for sales. Petitioner's business is that of a machine tool sales organization representing different machine tool manufacturers. Commissions range from 2 per cent to 15 per cent according to the price and character of the product which it sells. On all sales, the manufacturer ships direct to the purchaser. However, petitioner collects the payments from the customers in most of its accounts. Under this method, called direct sales, petitioner pays the cost of the product, less its commissions, to the manufacturer when the manufacturer ships the product to the purchaser; and, thereafter, petitioner collects the purchase price from the purchaser. Another method is followed under which the purchaser pays the manufacturer. *149 Under that method, the manufacturer pays the commission to petitioner. Barney Company has never carried on any manufacturing operations. It was generally understood between Barney Company and the manufacturers which it represented that it would confine its business to that of a selling organization, and that it would not manufacture machine tools or otherwise enter into competition with manufacturers of machine tools. It did not deal in second-hand materials, and it did not have a service or repair department. Harry Barney and Russell Niemeier spent the major portion of their time on selling activities, in addition to other duties which devolved upon them as the officers and managers of the Company. In addition to their selling services, the Company employed the services of three or four salesmen. Barney and Niemeier were paid salaries, but in addition they were paid commissions on their sales on the same basis the other salesmen were paid. Every salesman, including Barney and Niemeier, had certain sales territories which each covered. Barney and Niemeier received commissions on the basis of 15 per cent of the profit on sales, which was the same rate of commissions paid to other *150 salesmen. Issue 1. - On April 12, 1940, W. S. Bowling, of Canfield, Ohio, Harry Barney, and Russell Niemeier executed an agreement to associate themselves under the name "W. S. Bowling, Harry Barney and Russell Niemeier, Associates." The agreement provided that the association should be for two years, and could be continued from year to year, subject to the right of any party to terminate the agreement at the end of the first period or at the end of any renewal period. The purpose of Associates, as stated in the agreement, was as follows: "FIRST: The parties hereby associate themselves in the designing, engineering, building, having built, installation and servicing of special machines of all types, to meet any purpose or requirement, said association, however, to exist and be carried on only in accordance with the terms and conditions hereinafter set forth." The agreement provided, also, that "All machines designed under the terms of this Agreement shall be known as "B & B Special Machines" and all drawings, plans, specifications, data and patterns therefor or relating thereto shall belong to the parties of this Agreement and shall be used only for the building of machines *151 pursuant to the provisions of this Agreement." Under the agreement, Bowling agreed to furnish all designing, engineering, drafting, and developmental work upon all patterns for "B & B Special Machines," to furnish such work at his own expense, and to give services in connection with the installation and servicing of the B & B Special Machines. His share of receipts of Associates was fixed at 66 2/3 per cent, which share was larger than that of Barney or Niemeier because he was to defray the costs of the work he was to do. Barney and Niemeier were to render consulting services. Their shares of all sums received by Associates was fixed as follows: Barney, 20 per cent, and Niemeier, 13 1/3 per cent. At about the same time, on April 23, 1940, an agreement was executed by W. S. Bowling, Harry Barney and Russell Niemeier, Associates, parties of the first part; and Barney Machinery Company, party of the second part. The purpose of this agreement was to have Barney Machinery Company sell B & B Special Machines under an exclusive selling agency. Under this agreement the parties of the first part agreed that they would "design, build, cause to be built, install and service all 'B & B Special *152 Machines' which might be contracted for by the Barney Machinery Company under orders from customers at prices satisfactory to the parties of the first part." Barney Machinery Company was to receive for the various services which it was to perform under the contract, 10 per cent of sums received from customers on all sales made by it within the Pittsburgh territory, or 5 per cent on sales made through another agent or broker outside the Pittsburgh territory, the other 5 per cent going to the broker. The party of the first part was to receive the balance of the contract price for the sale of the B & B Special Machines, after payment of any other expenses or costs. The agreement was made for an original term of two years, renewable on a year to year basis. The agreements of April 12, 1940, and April 23, 1940, are incorporated herein by this reference. The considerations and events which caused the execution of the agreements were as follows: In 1939, orders were being placed by foreign governments with concerns in the United States for machine tools and shells, among other things. Pullman Standard Car Manufacturing Company had a British contract in 1939 under which they were to *153 machine six-inch shells. Pullman Company needed machinery for that work. The chief of its ordnance department went to Harry Barney for aid in locating the required special machinery. Barney knew of the need for special machines for machining shells from this inquiry and from other sources. Barney became very familiar with shell production during the First World War. From his experience he realized that there was need for developing special machines for machining shells which could operate at higher cutting speeds and could produce a greater volume of output than could be done with standard machine tools. Also, he was acquainted with the problem of shortages of skilled operators of machine tools. In the summer of 1939, when defense production and production for foreign governments brought increased business to the machine tool industry, Barney began working on a plan for the building of a special purpose shell lathe for a single operation, capable of using carbide cutting tools and operating at high speeds which could be operated by ordinary workmen or girls. Barney worked out his ideas in rough form and took them to W. S. Bowling who was a general engineer and who could make engineering *154 drawings from which machines could be constructed. Bowling had an office and employed two or three draftsmen. Bowling made up the required engineering drawings of the designs. Barney consulted Niemeier on the problems of using carbide tools and using high cutting speeds, subjects of which Niemeier had special knowledge. One special machine was built by Enterprise Company from Bowling's drawings. The ideas of Barney and Niemeier were successfully developed and put into sales engineering drawings by Bowling. The combined efforts of the three men developed to the point that they knew they had succeeded in designing special machines for which there was a demand. In the spring of 1940, they discussed the matter of the manufacturing and selling of the machines. Barney was the originator of many of the ideas, and the promoter. Since Barney Machinery Company was a selling organization, it was considered advisable to have that company take care of the marketing of the special machines. But from the outset, Barney and Bowling desired that a separate business enterprise should be formed which would own the plans and designs of the machines and would make arrangements for the manufacture thereof. *155 Bowling owned no stock in Barney Company and he did not want to become associated with that corporation or business. Barney sought advice and was assured that even though he was a stockholder of Barney Machinery Company, he could organize and carry on a separate business of the kind which would be involved in designing and producing the special machines. Upon the consideration described above, the three men became associated as joint venturers by entering into the agreement of April 12, 1940. During the period April 9, 1940, to December 31, 1940, orders for special machines were completed at the total sales prices of $54,198. The net profit realized during this period including design, engineering and services fees of Associates was $29,245. During the calendar year 1941, the sales price of completed orders was $1,158,067.07; costs of manufacture, engineering, and commissions were $923,126.36; expenses were $5,035.74; and net profit was $229,904.97. The venture was in its early stages in 1940. The Association of Bowling, Barney and Niemeier continued until August 7, 1943, when it was terminated. In 1943, the Government began reducing its orders for shells. At that time there *156 were no unfilled orders. The period of the venture was, therefore, about three years. During 1940, Barney and his associates continued working on and improving the designs for special machines for special purposes. They designed a new machine in 1940 called a bomb spinner on which bombs were spun from hot metal. This was a new development in making bombs and Bowling, Barney and Niemeier claimed that the machines which they had made in 1940 for this purpose were the first machines used in the industry. No bomb spinners were sold during the period January to October, 1941; but in the later part of 1941, Pittsburgh Ordnance placed orders with Barney Machinery Company for twenty-one bomb spinning machines, and later increased the order to forty. The venture, therefore, was devoted to the production and sale of three chief machines, as follows: B & B shell lathes, B & B cylinder sleeve machines, and B & B bomb spinners. Several types of shell lathes were designed and produced. The prices of the shell lathes ranged from $6,500 to $14,000, a piece. The machines were faster than standard machines and produced larger volume. The purpose of Bowling, Barney and Niemeier was to design special *157 machines of high speed and output, and they continually worked on the development of new features such as the use of electric motors with high horse power on the machines. The designing of the bomb spinner achieved the change from making bombs out of flat sheet metal to using a seamless tube, spinning it hot on a machine with a 250 horse power motor. This was considered to be a new art in the industry. Labor shortages led to the development by Bowling, Barney and Niemeier of a robot control so that the bomb spinning machines became automatically operated, without the necessity of human operators. On these newly developed machines, bombs of 500 pound, 250 pound, and 100 pound sizes were produced cheaper and faster than under other methods. Bomb spinning machines sold for from $40,000 to $72,000. During 1940 and the early part of 1941, the B & B Special Machines were manufactured to fill orders. The orders were obtained by Barney Machinery Company. The arrangements for manufacturing to fill the orders were made by Bowling, Barney and Niemeier, as associates. Production was by several concerns - Youngstown Foundry and Machine Company, hereinafter referred to as Youngstown; McKay Machinery *158 Company; Aetna Standard; and Kent Machine Company, under oral agreements to make B & B Special Machines according to the designs, plans and specifications of Associates. Youngstown constructed a substantial number of machines. A man named Thomas, the chief draftsman of Youngstown, worked with Bowling on designs and the engineering drawings. In due course, Associates practically "took over" the entire engineering department of Youngstown. In the summer of 1941, national defense orders for machines and shells, and the general extent of production of war materials was absorbing production capacities of plants. Youngstown was beginning to receive orders to build other equipment besides the B & B Special Machines. It became evident that special arrangements would have to be made with Youngstown to get a priority over its plant production for the production of the B & B Special Machines. Also, it became evident that the orders for the bomb spinning machines and shell lathes would increase. Niemeier had been in Washington conferring about Government orders for bomb spinners. Youngstown asked for a written contract and better terms than it had received under the oral arrangements, and for *159 reimbursement of a loss of $70,000 which it had sustained under the oral agreement. Youngstown wanted to share in the profits. As a result of Youngstown's demands, conferences among attorneys were held, and an agreement was drawn up to which the named parties were to be Bowling, Barney and Niemeier, as associates, and Youngstown. It was agreed that the terms of the new agreement would be effective from August 7, 1941, but no agreement was executed in August. There were delays, and in October, Harry Barney was stricken with a heart attack. He was too ill to discuss business matters for about seven weeks. When discussions and negotiations were resumed with Youngstown, Youngstown insisted that the agreement should be made with Barney Machinery Company. Youngstown wanted to be paid its costs prior to any payments to Associates. The agreement which had been drawn up as between Associates and Youngstown, therefore, was not executed. Negotiations continued into December 1941. In December, attorneys which had been consulted by Harry Barney, drafted four agreements, dated as of August 7, 1941, which were executed in January 1942. These agreements were as follows: (a) A new agreement between *160 Bowling, Barney and Niemeier to carry on certain work as associates, which amended and took the place of the agreement among the same parties dated April 12, 1940. (b) A new agreement between Bowling, Barney and Niemeier, as associates, and Barney Machinery Company which cancelled and superseded the agreement of April 23, 1940. (c) An agreement between Barney Machinery Company and Youngstown (Ex. 10). (d) A companion agreement between Barney Machinery Company and Youngstown (Ex. 9). The four agreements are incorporated herein by this reference. The agreement between Barney Machinery Company and Youngstown recited inter alia that, Barney Company had been engaged in selling B & B Special Machines built according to the designs, plans and specifications of W. S. Bowling, Harry Barney and Russell Niemeier, Associates; that such machines were installed and serviced by Associates; that Associates had granted Barney Company the exclusive right to sell the special machines in its own name and to contract for their construction in its own name; and that Youngstown had been engaged in the manufacture of B & B Special Machines for some time before according to the designs of Associates. The *161 parties to the agreement agreed, inter alia, as follows: "(1) That every B & B special shell lathe in sizes from 75 mm to 155 mm, and every B & B special bomb spinner which Barney Company hereafter contracts to deliver shall be built and constructed by Youngstown. "(2) That Youngstown would build such B & B machines according to the designs, plans and specifications of Associates to the limit of its capacity; and time being of the essence, Youngstown would give priority to each order it received for such machines in its work schedules and plant production and build and have ready for delivery such machines on designated dates; provided that if Youngstown's promised date of delivery, designated in advance, should be unsatisfactory to the buyer, then such order could be placed with some concern other than Youngstown, and Youngstown would cooperate to procure manufacture by another concern. "(3) That as payment for work performed, Youngstown would receive its full compensation from the selling price of each machine when collected by Barney Company from the purchaser; and that the selling price for each machine made by Youngstown, when collected by Barney Company should be applied *162 as follows: (a) Youngstown was to be paid its actual cost in producing a machine at its regularly scheduled rates for machines and engineering work, plus the costs of materials; (b) 5 per cent of the selling price of each machine was to be retained by Barney Company as its sales commission and for its services; (c) 5 per cent of selling price was to be paid to W. S. Bowling individually, for his services in engineering, installing, and servicing the machines; (d) and after applying the selling price as above set forth, and after paying any replacement of parts or change of parts costs, the then remaining balance was to be distributed 33 1/3 per cent to Youngstown, and 66 2/3 per cent to Associates. It was also agreed that if a sale of a special machine should result in a loss the loss would be borne by Youngstown and Associates in the same proportion. "(4) That Youngstown would not be required to accept an order until it first approved the credit rating of the purchaser. "(5) That Youngstown would furnish Barney Company monthly billings of work done on machines during the previous month, and would furnish Associates a duplicate statement of its costs upon completion of each order, *163 and that it would accurately keep its construction sheets and scheduled rates, and that such would be subject to inspection by the Associates. "(6) That the term of the agreement was for two years, and thereafter from year to year unless terminated after written notice by a party or the parties." The agreement was signed by Barney Company and Youngstown, and by Bowling, Barney and Niemeier as the Associates. The second agreement between Barney Company and Youngstown, designated as a "companion agreement" effective as of August 7, 1941, and to run concurrently with the agreement which has been described above, was executed at the same time by Barney Company, Youngstown, and Bowling, Barney and Niemeier, as the Associates. This agreement provided for payments to Youngstown out of the selling price of all B & B special shell lathes in sizes from 75 mm to 155 mm, and all B & B special bomb spinners which might be manufactured by concerns other than Youngstown. The purpose of making such payments to Youngstown was first, to reimburse Youngstown for the loss of $70,000 which it had sustained previously in making the B & B special machines, and to pay Youngstown part of the profits *164 to be received from the sale of the Special Machines which might be made by others. The companion agreement recited that Youngstown had heretofore constructed special machines to fill orders from Barney Company, upon which it had sustained a loss exceeding $70,000; that Youngstown had performed considerable experimental work in developing and perfecting the special machines; and that Youngstown was in a position to furnish engineering work on special machines to be manufactured by others and to give other services and advice. Under the companion agreement, it was agreed, inter alia, as follows: "(1) Youngstown agreed to render such engineering services as Barney Company and Associates might require in connection with special machines built by others, and to cooperate with Barney Company and Associates in assisting and advising other plants in the most efficient methods of constructing the machines. "(2) Barney Company agreed, with the approval of Associates, with respect to the 75 mm to 155 mm shell lathes and the bomb spinners constructed by others to pay Youngstown its actual engineering expenses on machines so built; and to pay Youngstown 15 per cent of the net profit realized *165 from the sale of special machines built by others until Youngstown shall have received $70,000; and, thereafter, to pay to Youngstown 10 per cent of the net profit on the sales of such machines. In arriving at net profits, or loss, if any, the agreed basis of costs was to include 5 per cent of the sales price for Bowling for his services; and 5 per cent of the sales price for Barney Company for its services and selling commission. Loss, if any, was to be borne by the parties in the same proportion as they would have shared in the net profits." The chief changes in the August 7, 1941, agreement of Bowling, Barney and Niemeier, Associates, from the terms of the original April 12, 1940, agreement were that 5 per cent of the selling price of each B & B Special Machine sold was to be paid to Bowling for his services, and the shares of each of the associates in all sums received by Associates was changed so that the shares were to be: Bowling, 50 per cent (formerly 66 2/3 per cent); Barney, 25 per cent (formerly 20 per cent); and Niemeier, 25 per cent (formerly 13 1/3 per cent). Also, there was a more detailed provision describing the work that Associates was engaged in and the bomb spinning *166 machines were mentioned. [1] Otherwise, the terms of the 1941 agreement between Bowling, Barney and Niemeier were substantially the same as the 1940 agreement. *167 The August 7, 1941, agreement between Associates and Barney Machinery Company was substantially the same as the original 1940 agreement. Associates granted to Barney Company the exclusive right to sell, in its own name, B & B Special Machines designed by Associates; the Company agreed to lend its credit to the enterprise and to represent Associates in securing outlets for the services and machines of Associates, and to submit to Associates for acceptance all inquiries from brokers. The changes in the new agreement from the terms of the old agreement were, chiefly, that all contracts by Barney Company should be approved, first, by Associates, [2] that payments should be made to Youngstown in accordance with the agreements with that company; that Bowling and Barney Machinery Company, each, should be paid 5 per cent of the selling price for their respective services; that payments of net receipts should be paid to Associates, 50 per cent to Bowling, 25 per cent to Barney, and 25 per cent to Niemeier. A new clause was added as follows: "FOURTH: The ASSOCIATES do, for themselves, their heirs and assigns hereby indemnify and save harmless the said 'Barney' for loss for which it is liable *168 as contractor with purchaser and manufacturer where an actual loss is sustained in the difference between the selling price and the costs of manufacture as specified in Paragraph Third hereof." The usual rate of sales commission which Barney Machinery Company received *169 in the course of its usual business for the sale of large machines comparable to the B & B Special Machines was 5 per cent. At a special meeting of the directors of Barney Company on August 4, 1941, a resolution was adopted authorizing the officers to enter into the proposed new agreements with Associates and Youngstown, approving reduction of the commission of Barney Company from 10 to 5 per cent, and calling for proper indemnification of the company for losses. The stockholders of Barney Company approved the execution of the original agreement of April 23, 1940, with Bowling, Barney and Niemeier, as Associates, at a special meeting of stockholders on April 23, 1940. The resolution which was adopted was as follows: "WHEREAS: This Corporation heretofore has been and is now engaged in the business of selling machinery and, while it may have the corporate power to do so, has never engaged and does not now deem it advisable to engage in the business of designing and building special or other machinery; and "WHEREAS: Harry Barney and Russell C. Niemeier, officers, directors, and shareholders of this Company, have associated themselves with one, W. S. Bowling, in the designing, building, *170 installation, and servicing of special machines known as 'B & B Special Machines'; and "WHEREAS: Said business does not interfere with the duties of the said Barney and said Niemeier upon behalf of this Corporation, and they and their said Associate have offered to this Corporation an exclusive license to sell 'B & B Special Machines,' upon the terms and conditions set forth in a proposed Agreement dated the 23rd day of April, 1940, presented before this Stockholders' Meeting; and "WHEREAS: It is to the best interest and advantage of this Corporation to secure said exclusive license and to enter into said Agreement in order to enable it to meet all requirements of its customers. "NOW, THEREFORE, BE IT RESOLVED THAT the proper officers of this Corporation, as and for its act and deed under its corporate seal, execute and deliver that certain Agreement between W. S. Bowling, Harry Barney, and Russell C. Niemeier, Associates, dated the 23rd day of April, 1940; and "BE IT FURTHER RESOLVED That the Secretary of this Corporation record a copy of said Agreement upon the Minutes." The stockholders of Barney Company consented to the supplemental agreement of August 7, 1941, with Bowling, *171 Barney and Niemeier, Associated. The four agreements described above remained in effect without change until Associates was terminated in August, 1943. The respective shares of Harry Barney and Niemeier in the net receipts from the sale of B & B Special Machines under the terms of each agreement of Associates were not in the same percentage or ratio as their respective interests in Barney Machinery Company, as evidenced by their stock holdings. The accountant for Barney Machinery Company, who was associated with Lybrand, Ross Brothers and Montgomery in 1939, 1940 and 1941, set up a separate account on the books of Barney Machinery Company to reflect the provisions of the contract with Associates. Separate accounts were carried for each order for a B & B Special Machine. A separate account was carried for Bowling, Barney and Niemeier, Associates. All monies paid to a manufacturer of machines was charged to Associates' account on the books of the Barney Company. The accountant furnished accounting reports to Bowling, Barney and Niemeier from time to time. Financial statements of Bowling, Barney and Niemeier, Associates, were prepared by the accounting firm of J. R. McCarten & Co. *172 Separate accounts were clearly kept of the account of Barney Machinery Company with Associates; and of the receipts and disbursements of Associates. Youngstown did not build all of the B & B Special Machines, but other manufacturers were used besides Youngstown. The sales of the special machines were subject to the regulations of the Office of Price Administration, (O.P.A.). Schedules of prices of the special machines were filed with O.P.A. by Associates, and by Barney Machinery Company. The profits realized from the sales of the B & B Special Machines in the years 1942 and 1943 were renegotiated under the Renegotiation Act, and refunds of profits were made to the Government after the renegotiation by both Barney Machinery Company and Associates. The accountant who took care of Associates and Barney Company's accounting filed information returns on Form 1099 reporting distributions to Bowling, Barney and Niemeier, but he did not file income tax returns for the joint venture on Form 1065 on time. He believed it was unnecessary to file a tax return for a joint venture as an entity. Income tax returns for Associates, on Form 1065, were filed late for the years 1940 and 1941. *173 After Bowling, Barney and Niemeier, Associates, was terminated, Barney died, on September 6, 1944; and Bowling died on December 26, 1945. The designing, planning, and improving the designs of specal shell lathes, bomb spinning machines and other machines called B & B Special Machines constituted business activity undertaken for profit. The B & B Special Machines were new machines in the machine tool industry, representing new designs and methods of operation which were conceived and developed by the individual efforts of Barney, Bowling and Niemeier. The designs and plans of the machines belonged to Bowling, Barney and Niemeier, Associates. They intended and did form a business association for the purpose of making the designs and plans of new special purpose machines and for the purpose of having the machines built for sale to customers. Barney, Bowling and Niemeier, as Associates, devoted time and effort to locating manufacturing concerns who could and would construct the special machines, and they, as Associates, made the basic and underlying arrangements for having the special machines built. Bowling, Barney and Niemeier, Associates (or Associated, both terms being used from *174 time to time) constituted a joint venture having business purposes, which was separate and distinct from the corporation, Barney Machinery Company. Associates was a bona fide business venture originally and at all times. Barney Machinery Company was a selling organization. Prior to the organization of the joint venture, Associates, it had certain established methods of handling sales of machines known as the direct method and the indirect method. It was customary for Barney Company to pay a manufacturer the entire price of a machine less its sales commission, and to collect the selling price from the customer, thereby using its own capital in the direct sales method. Irrespective of the method of sale and collection used by Barney Company, it was customary for the relationship of Barney Company to the concern which it represented to make the written contract an exclusive sales agency contract. The arrangements which were followed in the obtaining of orders for the B & B Special Machines, and the handling of funds by Barney Machinery Company were consistent with its established practices in handling sales of other, standard machines. With respect to the B & B Special Machines, Barney *175 Machinery Company rendered services for which it received payment on a commission basis. Its function and business activities in connection with the B & B Special Machines were separate and distinct from the business activities of Associates. Barney Machinery Company was not a member of the joint venture called "Associates." Issue 2. - The sales force of Barney Machinery Company consisted of Barney, Niemeier and two salesmen in 1939, and thereafter, except that in 1940 an extra salesman was employed to take care of a new line of specialty supplies, and an extra salesman was employed in the latter part of 1941 after Barney became ill. During 1940 and 1941 Barney and Niemeier worked substantially all of the usual business time, plus overtime in the business of Barney Machinery Company. The commissions paid to Barney and Niemeier on sales of machines which each made were paid on the same basis as other salesmen's commissions. The rate of the commissions paid to all salesmen, including Barney and Niemeier, in 1940 and 1941, was the same rate which had been paid in earlier years, 15 per cent of the gross profit on each sale. In 1940 and 1941, commissions on sales made by Barney amounted *176 to $9,129.91, and $27,262.06, respectively; and the commissions on sales made by Niemeier amounted to $8,895.25, and $24,230.19, respectively. These amounts were earned commissions, which were earned through the individual efforts of Barney and Niemeier. During the years 1936 through 1939, Barney and Niemeier were paid the same basic salary of $3,600 per annum. The directors voted Barney additional compensation for the year 1937 in the amount of $5,000 because during that year he had been obliged to devote more time to the work of management of the business and less time to sales, and the directors found that he was not adequately compensated for his services at the fixed salary of $3,600. The directors voted an equal increase in the salaries of Barney and Niemeier to $10,000 in 1940, and to $12,000 in 1941. With respect to Barney, the fixed salary voted him for 1940 and 1941 was less than his fixed salary of $15,000 in the years 1929 through 1931. The policy of Barney Machinery Company in fixing the salaries of its chief officers was conservative in 1940 and 1941, and in prior years. Fixed compensation was decreased by the directors, or increased depending upon whether the *177 volume of business decreased or increased. A bonus, compensation in addition to fixed salaries, was voted by the directors to Barney and Niemeier for 1940 in equal amounts of $4,400 each. In 1941, the directors voted bonuses to eleven employees, including Barney and Niemeier, on account of overtime and additional work incident to the increased business of the company in 1941. Barney and Niemeier, each, was voted a bonus of $3,000. The fixed compensation of Barney (salary and bonus), for 1940 was $14,400; and for 1941, it was $15,000. Niemeier's fixed compensation in each year was the same. The above amounts represented reasonable compensation for managerial services actually rendered by Barney and Niemeier, apart from commissions on sales. The fixed salaries, bonus payments, and commissions on individual sales of Barney and Niemeier for the years 1929 to 1941, inclusive, were as follows: Harry Barney
Total
Individual
Total
Salaries and
Sales
Compen-
Year
Bonus
Commissions
sation
1929
$15,000.00
None
$15,000.00
1930
15,000.00
None
15,000.00
1931
$15,000.00
None
$15,000.00
1932
8,529.53
None
8,529.53
1933
1,683.67
None
1,683.67
1934
2,400.00
None
2,400.00
1935
2,700.00
None
2,700.00
1936
3,600.00
$ 6,401.65
10,001.65
1937
8,600.00
2,717.95
11,317.95
1938
3,600.00
3,019.12
6,619.12
1939
3,600.00
1,678.22
5,278.22
1940
4,400.00 *
10,000.00
9,129.91
23,529.91
1941
3,000.00 *
12,000.00
27,262.06
42,262.06
Russell C. Niemeier
1929
3,000.00
5,331.32
8,331.32
1930
3,000.00
12,908.89
15,908.89
1931
3,000.00
1,931.17
4,931.17
1932
2,950.00
2,066.11
5,016.11
1933
1,925.00
None
1,925.00
1934
2,400.00
None
2,400.00
1935
2,900.00
None
2,900.00
1936
3,600.00
5,116.15
8,716.15
1937
3,600.00
10,223.13
13,823.13
1938
3,600.00
3,089.91
6,689.91
1939
3,600.00
2,486.01
6,086.01
1940
4,400.00 *
10,000.00
8,895.25
23,295.25
1941
3,000.00 *
12,000.00
24,230.19
39,230.19
*178 The relationship of the total compensation paid to the two chief officers of petitioner, Barney and Niemeier, to net sales and gross profit during the years 1929 to 1941, inclusive, is as follows: Total
Cost of
Gross
Net Income
Officers'
Year
Net Sales
Goods Sold
Profit
Before Taxes
Compensation
1929
$1,419.968.19
$1,263,565.15
$156,403.04
$ 66,312.57
$23,331.32
1930
1,086,876.54
938,709.71
148,166.83
49,587.35
30,908.89
1931
435,913.95
389,438.16
46,475.79
(26,089.68)
19,931.17
1932
308,910.49
281,468.93
27,441.56
(26,429.21)
13,545.64
1933
130,022.46
113,291.08
16,731.38
(11,841.88)
3,608.67
1934
145,434.38
129,211.55
16,222.83
( 4,513.42)
4,800.00
1935
441,205.21
391,332.70
48,872.51
(10,827.00)
5,600.00
1936
502,173.45
447,716.84
54,456.61
1,510.73
18,717.80
1937
1,103,416.51
987,479.21
115,937.30
45,702.07
25,141.08
1938
588,501.95
523,500.17
65,001.78
5,577.72
13,309.03
1939
453,599.45
399,947.44
53,652.01
( 2,198.08)
11,364.23
1940
1,657,646.12
1,482,325.80
175,320.32
61,565.91
46,825.16
1941
5,909,451.19
5,320,138.26
589,312.93
399,278.32
81,492.25
*179 During the period of six years, 1936 to 1941, both years inclusive, petitioner paid dividends of $21,400, in 1937; $21,500, in 1940; and $21,940, in 1941. Dividends were not paid in the other years, 1936, 1938, and 1939. The earned surplus of petitioner as of December 31 of 1939, 1940, and 1941, was, respectively, $13,177.77; $28,530.32; and $102,758.92. The total compensation in 1940 and 1941 of Barney was $23,529.91 and $42,262.06. More than half of his compensation in 1941 represented commissions on personal sales. The total compensation paid to Barney for services rendered in 1940 and 1941 was reasonable. The total compensation in 1940 and 1941, paid to Niemeier was $23,295.25 and $39,230.19. Such sums constituted reasonable compensation for services actually rendered. Opinion Issue 1. - The general question under this issue is whether there was a joint business venture conducted by three associates, Bowling, Barney and Niemeier. The income to be taxed is the net income realized after all costs, including payments to Bowling and commissions to Barney Machinery Company and to Youngstown, during part of the period. The period involved is April to December, 1940, and the *180 calendar year 1941. Respondent contends that the earnings and profits in question are taxable to petitioner, Barney Machinery Company, on the theory that there was a joint venture consisting of Bowling and Barney Machinery Company. Respondent, accordingly, determined that the shares of earnings of the joint venture which were considered as distributable to the individuals, Barney and Niemeier, were distributable to petitioner and such income has been taxed to petitioner as the earner and producer of such earnings. On brief, respondent contends that all of the distributions of such earnings to Barney and Niemeier were, in fact, "dividends" paid to them by the petitioner. (Respondent describes such alleged distributions as "preferential dividends." We understand the expression "preferential" to be one of convenience only. The issue presented does not involve the technical one of preferential dividends such as, for example, would arise under section 27 (h), Internal Revenue Code. Cf. New York Stocks, Inc., 8 T.C. 322.) Petitioner denies having earned and produced the income which respondent asserts was its income. Petitioner rests its case on the contention that the joint *181 venture consisted of the three individuals, Bowling, Barney and Niemeier; and petitioner denies that it, a corporation, was a member of the joint venture. Petitioner contends that the actual personnel of the joint venture should not be ignored for tax purposes. The question presented is a question of fact. Upon careful consideration of all of the evidence our conclusion is that there was a bona fide joint venture, having business purposes, which consisted of the three individuals, Bowling, Barney and Niemeier. The evidence, in our opinion, does not support the theory upon which respondent based his determination. Where the evidence shows that individuals intend and actually do carry on a business venture as a distinct business entity, their claim to recognition of their business activities as distinct from other business activties which they conduct is not to be defeated solely because of some other business relationship, as for example, ownership of stock in a corporation. The business of a corporation may be entirely separate from a business conducted by its stockholders, depending upon the facts. Seminole Flavor Co., 4 T.C. 1215, 1234, 1235; Ross v. Commissioner, 129 Fed. (2d) 310. *182 Recognizing certain differences in facts, we find much similarity here to the situation in Seminole Flavor Co., supra. Respondent argues that there was no substance to Associates, a combination of three individuals, and that it should not be recognized for tax purposes. He relies upon the rationale of Higgins v. Smith, 308 U.S. 473; Griffiths v. Helvering, 308 U.S. 355; Gregory v. Helvering, 293 U.S. 465; and other cases where the courts have found that the substance of arrangements were other than the outward forms upon which taxpayers relied for tax purposes. But we do not find the present case to be one where the substance calls for putting the petitioner corporation in the place of the two individuals, Barney and Niemeier. We agree that the relationship of the two men to the petitioner corporation invites close scrutiny of the facts, but upon the careful analysis of the evidence which we are admonished to make, we must sustain the claim that the joint venture's members were the two individuals rather than the corporation. The earnings which are to be taxed were derived from ideas about new machines for specal purposes which *183 were in the minds of the three individuals, and which were developed into the plans and designs from which the machines were made. Those plans and designs were the property of the three individuals, associated. There were business reasons which prompted the decision to separate the manufacturing arrangements from the selling activities. We accept those reasons as valid and honest reasons for the agreements between Associates, as a joint venture, and Barney Machinery Company. There is testimony that tax consequences were not the reason for establishing a venture separate from petitioner. The bona fides of the parties are demonstrated by the evidence. The argument of respondent grows out of the arrangement whereby Barney Company handled all of the money side of each transaction. If this stood alone, there would be more doubt cast upon Associates as a separate entity of which Barney Company was not a member. But taking all of the evidence into consideration, we conclude that such method of handling collections from sales to pay manufacturing costs and other costs does not defeat the claim of petitioner that it was not a member of the joint venture called Associates. Machines were manufactured *184 to fill orders. As we understand the evidence, Barney Company sold machines from the printed plans for machines, and then the machines sold in advance of manufacture were constructed. It was customary in the selling of standard machines for Barney Company to sell machines from catalogues or prints of manufacturers, to pay the manufacturer when a machine was shipped to a customer, cost less commission, and to collect from the customer the entire selling price. That is what Barney Machinery Company did as selling agent for Associates. It is held that petitioner was not a member of the joint venture, and that Associates was composed only of the individuals Bowling, Barney and Niemeier. The contention that distributions of earnings of Associates to Barney and Niemeier constituted "dividends" of petitioner must be rejected for the reasons which this Court rejected a like contention in Seminole Flavor Co., supra, at p. 1232, recognizing the point that section 45 of the Internal Revenue Code is not involved in this case. Under this issue, respondent's determination is reversed. Issue 2. - Respondent disallowed part of the deductions taken for 1940 *185 and 1941 by petitioner for compensation paid to Barney and Niemeier. His determination is that $16,000 in 1940 and $20,000 in 1941 represented excessive compensation for officers, and these amounts were added to the taxable income of petitioner for the respective years. In making this determination respondent made no allocation of the amounts disallowed to either of the officers. Failure to do so, however, does not relieve petitioner from the usual burden of proof. See Miller Mfrg. Co. v. Commissioner, 149 Fed. (2d) 421; D. & N. Auto Parts Company, 8 T.C. 1192 (No. 140). The question of what constitutes a reasonable amount as the compensation for services actually rendered for purposes of business expense deduction under section 23 (a) (1) (A) of the Internal Revenue Code is a question of fact. Upon consideration of all of the evidence, it is concluded that the amounts of the fixed salaries and bonus of each of the officers of petitioner for 1940 and 1941 represented reasonable compensation for the managerial services rendered by each officer to petitioner in the taxable years; and that the rates of commissions paid to the officers *186 for their personal sales for the petitioner constituted a reasonable rate of commission; and that the total amounts of the compensation paid to each officer, consisting of fixed salary, bonus, and commissions were reasonable in amount, and are, therefore, deductible. The evidence shows that the business of petitioner, the sale of machine tools, is a cyclical business. Earnings may be high in one year and they may be low in other years. Petitioner's method of paying compensation to its officers took this into account by the system of paying them a fixed salary for their managerial work, and commissions for their actual sales. The increase in the commissions earned in 1940 and 1941 was due to an increase in the volume of business which greatly increased in 1941. Petitioner did not increase its sales force. Consequently, its salesmen made more sales and thereby earned commissions in high amounts compared to years when the volume of business was very much lower. The two officers of petitioner were salesmen and it appears that they worked in exactly the same way as other salesmen. They had their territories to cover just as other salesmen. The fact that the two officers made more sales *187 and that, consequently, the amounts of their commissions went up does not provide an adequate reason for disallowing petitioner business expense deductions for the commissions paid unless the rate of commission was unreasonable in some respect. The rate of commission was the usual rate which had been paid for many years prior to the taxable years. The commissions were earned in the sense that they were payments on account of the expenditure of personal efforts in the sale of goods. The question presented grows out of the fact that the commissions constituted the major part of the total compensation paid to the two officers. We must consider the fact that a substantial part of the compensation represented commissions rather than treat the deduction claimed as a total item irrespective of how it was made up. The evidence shows that the two officers were the life of the petitioner corporation, and that they performed very valuable services in the management of petitioner. We must conclude that the fixed salaries and bonuses for the taxable year were reasonable. Since the commissions were earned in connection with the sale of goods, we think deduction for commissions earned must be *188 allowed just as the commissions paid to other salesmen are deductible. It is concluded that respondent erred in disallowing deductions in 1940 and 1941 in the respective amounts of $16,000 and $20,000. Decision will be entered under Rule 50. Footnotes
1. The August 7, 1941, agreement provided, in part, as follows: * * *
THAT, WHEREAS, the parties hereto are experienced in the designing of machinery for special purposes; and WHEREAS, the parties have all devoted a large portion of their time in recent years in acquiring knowledge and experience in regard to the needs for and uses of special machinery, have developed markets for the same, have ascertained the plants or mills which are capable of manufacturing such special machinery, have assisted and advised such plants and mills in experimental work on such special machinery, and as a result thereof have acquired a unique knowledge of the designing and manufacture of such special machinery and have together spent a great deal of time in developing and have heretofore developed bomb spinning machines, cylinder sleeve machines and shell lathes, which, from time to time, they are improving and redesigning. NOW, THEREFORE, in consideration of the premises, it is mutually agreed as follows: FIRST: The parties hereto hereby agree to associate themselves in the designing, engineering, building, having built, installation and servicing of special machines of all types, to meet any purpose or requirement; said association, however, to exist and be carried on only in accordance with the terms and conditions hereinafter set forth. * * *↩
2. Both the 1940 and the 1941 agreements contained substantially the same clause relating to contracts for the manufacture and contract for the sale of the special machines. The clause in the 1941 agreement is as follows: 1. Upon receipt of an inquiry or order from a customer whose credit is satisfactory to it, the COMPANY, upon the basis of data and prices furnished by the ASSOCIATES and satisfactory to them, shall enter into a contract between the COMPANY and the customer for the designing, building, installation and servicing of such Special Machines, and in its name shall enter into a contract with some manufacturer to build such Special Machines according to the plans, specifications and patterns furnished by the ASSOCIATES, such construction to be under the direction of the ASSOCIATES. Both of said contracts shall be first approved by the ASSOCIATES before they shall be executed by the COMPANY. * * *↩
*. Bonus.↩